UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EDWARD RIVEIRA JR., *et al.*, | CASE NO. C18-1211-JCC |
| Plaintiffs, | ORDER |
| v. | |
| SCOTT DRESCH, in his individual capacity, and DOES 1–10, | |
| Defendants. | |

This matter comes before the Court on Defendant's motion to dismiss Plaintiffs' second amended complaint (Dkt. No. 53). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

## I. BACKGROUND

In 1989, Plaintiffs Edward and Amanda Riveira founded Absolute Mobility Center ("AMC"), a business based out of their home. (Dkt. No. 51 at 2–3.) AMC sells wheelchair-accessible vehicles, supplied by Indiana-based Braun Corporation ("Braun"), and other mobility-assistance devices to customers, including veterans. (*Id.*) When qualified veterans purchase AMC vehicles, "the [U.S. Department of Veterans Affairs (the "VA")] would reimburse AMC certain costs associated with the transaction. This includes the cost of shipping the vehicles from

Indiana [Braun's location]." (*Id.* at 20.) Since starting the business, Plaintiffs have established AMC offices outside of their home. (*See id.* at 34.)

Defendant Scott Dresch is a Special Agent with the Internal Revenue Service's Criminal Investigation Division. (*Id.* at 4.) On August 17, 2015, Defendant swore an affidavit requesting search warrants in order to investigate Plaintiffs' alleged violations of provisions of the U.S. tax code, 18 U.S.C. §§ 287, 641, and 1001, as well as 26 U.S.C. § 7206(1). (Dkt. Nos. 51-1, 53 at 3.) The Honorable James P. Donohue, U.S. Magistrate Judge, issued the warrants. (Dkt. Nos. 51-2, 51-3, 51-4.)

On the morning of August 19, 2015, armed federal agents arrived at Plaintiffs' home while Mr. Riveira was present. (Dkt. No. 51 at 33.) At about the same time, Mrs. Riveira was pulled over by a Snohomish County Sheriff patrol car and another unmarked car while she drove through Plaintiffs' neighborhood. (*Id.*) After being detained for about 25 minutes, Mrs. Riveira was brought to Plaintiffs' home, and Plaintiffs were kept outside under armed guard while agents searched their home. (*Id.*) Agents also raided Plaintiffs' offices in Woodinville and Tacoma while AMC customers and employees were there, seizing records and computers. (*Id.* at 34.)

In March 2018, the U.S. Attorney's Office ceased its investigation into Plaintiffs' alleged criminal conduct without charging Plaintiffs. (*Id.* at 34–35.) Plaintiffs claim that they continue to experience financial, emotional, and reputational harms as a result of the agents' search of their home and offices. (*Id.* at 35–36.) On August 16, 2018, Plaintiffs sued Defendant in his individual capacity for allegedly violating Plaintiffs' Fourth Amendment rights against unreasonable searches and seizures. (Dkt. No. 1.) Plaintiffs later amended their complaint to revise examples from AMC account records, revise the number of boxes of records that were seized, and to add allegations regarding a confidential source ("CS1") who provided information contained in Defendant's warrant application. (*See* Dkt. No. 10.)

Defendant filed a motion to dismiss Plaintiffs' amended complaint for failure to state a claim and asserting a qualified immunity defense. (*See* Dkt. No. 33.) The Court permitted

Plaintiffs to file a second amended complaint, in which they asserted additional factual allegations related to Defendant's qualified immunity defense. (*See* Dkt. Nos. 45-1, 51.) Plaintiffs allege that the raids of their home and offices were based on overly broad and unparticularized warrants. (*See* Dkt. No. 51 at 6, 32.) Plaintiffs assert that Defendant obtained these warrants by knowingly and/or recklessly misrepresenting information about Plaintiffs' finances and transactional history, Plaintiffs' bookkeeping system, AMC's audit, and the credibility of CS1, a former AMC employee from whom Defendant obtained information to support his warrant affidavit. (*See id.* at 6–17.) Plaintiffs also allege that Defendant knowingly misrepresented the VA's cost reimbursement policy. (*See id.* at 17–32.) In response to Plaintiffs' second amended complaint, Defendant filed a renewed motion to dismiss raising the same claims and defenses. (*See* Dkt. Nos. 49 at 1, 53.)

## II.     DISCUSSION

### A.     Motion to Dismiss Legal Standard

A party may move for dismissal if the claimant "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A claim for relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief; and . . . a demand for the relief sought . . . ." Fed. R. Civ. P. 8(a). The statement must put a party on fair notice of the claim and its grounds. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In reviewing a motion to dismiss, the Court accepts all factual allegations as true and views them in the light most favorable to the nonmoving party, but need not accept conclusory allegations, unwarranted deductions of fact, or unreasonable inferences as true. *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001). To survive a motion to dismiss, a claim must be "plausible" in that the facts pled "allow[] the court to draw [a] reasonable inference" that a defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Determining plausibility is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

**B.  Qualified Immunity Legal Standard**

Government officials are immune from civil liability if "in performing discretionary functions . . . their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This standard is a low bar—qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). For purposes of a motion to dismiss, the Court applies the *Harlow* standard to the official's conduct "as alleged in the complaint." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

To overcome a qualified immunity defense, a party must show that he or she experienced a violation of a constitutional right and that the right was clearly established at the time of the official's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). If a party claims that the constitutional violation arose from the official's deceptive or reckless preparation of an affidavit for a search warrant, then the party must "make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *see also Chism v. Washington State,* 661 F.3d 380, 386 (9th Cir. 2011) (describing such inquiry as a showing of "judicial deception"). If the party makes such a showing, he or she is entitled to a hearing. *Id.* If the party fails to do so, the affidavit is presumed valid. *Id.* at 171. The *Harlow* question of reasonableness essentially "merges" with the *Franks* question of dishonesty or recklessness. *See Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002).

**C.  Fourth Amendment Search and Seizure Legal Standard**

The Fourth Amendment protects a person's rights "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Fourth

Amendment protections extend to seizures that are less than arrests and to all intrusions by public agents on personal security, in both civil and criminal investigations. *Terry v. Ohio*, 392 U.S. 1, 16–17 (1968); *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 755 (2010). There is "no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." *Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 536–37 (1967). Where a search warrant is mandated, "reasonableness" of search and seizure is measured in terms of whether "probable cause" exists to conduct the search. *Id.* at 534. Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

Plaintiffs' Fourth Amendment rights were clearly established at the time that Defendant prepared the affidavit. Defendant, as an experienced government official, is expected to have been aware of this right at the time he prepared the affidavit. *See Saucier*, 533 U.S. at 202. And a reasonable person would know that this right is available to all citizens. *See Harlow*, 457 U.S at 818. However, Plaintiffs do not establish that their Fourth Amendment rights were violated, and thus do not overcome Defendant's qualified immunity defense, because they do not plausibly demonstrate that (1) the warrants lacked sufficient specificity, *United States v. Kow*, 58 F.3d 423, 426–27 (9th Cir. 1995), or that (2) Defendant's affidavit contained knowing or reckless falsities and lacked a substantial basis for probable cause. *See United States v. Leon*, 468 U.S. 897, 914–15 (1984); *see also Franks*, 438 U.S. at 155–56.

1. <u>Sufficient Specificity</u>

To satisfy the Fourth Amendment's requirements, a search warrant must be sufficiently specific as to the items subject to seizure and the scope of the search, unless evidence of a "permeation of fraud" justifies a seizure of all records. *See Kow*, 58 F.3d at 426–28. When evaluating a warrant's particularity, the Court considers: (1) whether probable cause existed to seize the described items; (2) whether executing officers could objectively distinguish items

subject to seizure from those which are not; and (3) the feasibility of a more particular description of the items. *United States v. Hindman*, 2008 WL 2945482, slip op. at 3 (E.D. Wash. 2008) (citing *United States v. Adjani*, 452 F.3d 1140, 1148 (9th Cir. 2006)). Courts consider an affidavit to be part of the warrant, "and therefore potentially curative of any defects," if the warrant incorporates the affidavit by reference, and the affidavit is physically attached to the warrant or accompanies the warrant during the search. *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 699 (9th Cir. 2009).

Defendant's affidavit describes Plaintiffs' recordkeeping as "permeated with fraud," and provides circumstantial facts and a list of items to be seized. (*See* Dkt. No. 51-1.) Plaintiffs claim that the warrants were "overly broad and insufficiently particularized" and do not meet the "permeated with fraud" standard. (Dkt. No. 51 at 6–7, 37.) Defendant's affidavit is incorporated by reference in each of the three search warrants. (*See* Dkt. Nos. 51-2 at 2, 51-3 at 2, 51-4 at 2.) While it is unclear whether the affidavit itself accompanied the warrants during the searches, Attachments A and B of the affidavit were incorporated as attachments to the warrants. (*See* Dkt. Nos. 51 at 7; 51-2, 51-3, 51-4 at 4–10.) The warrants request seizure of "[a]ll records . . . of the types described below" and then name specific types of materials that pertain to named entities and serve a specified purpose. (*See, e.g.*, Dkt. No. 51-2 at 7–8); *see Adjani*, 452 F.3d at 1148–49. Plaintiffs fail to acknowledge items in Attachment B of the warrants that are sufficiently specific as to what is to be seized, such as "[a]ll contracts . . . related to Absolute Mobility Center, Braun Inc., Richs Inc." (*See, e.g.*, Dkt. No. 51-2 at 7–10.)

The warrants further objectively limit the search scope by specifying the criminal charges to which the items must pertain to, "for the time period of January 1, 2008 through the present." (*See, e.g., id.* at 7); *see United States v. Spilotro*, 800 F.2d 959, 964 (9th Cir. 1986) ("Reference to a specific illegal activity can, in appropriate cases, provide substantive guidance for the officer's exercise of discretion in executing the warrant."). Given the circumstances as described in the affidavit, such as the scope of possible criminal activity, the level of specificity in the

warrants was reasonable. (*See generally* Dkt. No. 51-1); *see Adjani*, 452 F.3d at 1149. As the warrants were not overly broad and contained sufficient specificity, the Court finds that they meet the Fourth Amendment specificity requirements. *See Adjani*, 452 F.3d at 1148.[1]

### 2. Probable Cause and Judicial Deception

Probable cause looks to the likelihood that evidence of a crime could be uncovered in a search, and is not concerned with the *prima facie* elements of a crime, such as *mens rea*. *See Chism*, 661 F.3d at 389. Reviewing courts give deference to a magistrate judge's determination of probable cause, unless the affidavit contains (a) a knowing or reckless falsity, and/or (b) lacks a "substantial basis" for determining the existence of probable cause. *United States v. Leon*, 468 U.S. 897, 914–15 (1984).[2] This inquiry into reckless falsity and lack of substantial basis mirrors the *Franks* test for defeating qualified immunity—an act of "judicial deception"—so the Court evaluates both inquiries together. *See supra* Section II.B. A claim of judicial deception cannot be based on "an officer's erroneous assumptions about the evidence he has received." *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009). The Court need not accept conclusory allegations of judicial deception as true. *Sprewell*, 266 F.3d at 988 (9th Cir. 2001); *see also Newt v. Kasper*, 85 F. App'x 37, 38 (9th Cir. 2003) (applying *Sprewell* conclusory allegation standard to judicial deception claim).

#### a. Knowing or Reckless Falsity

Plaintiffs claim that Defendant "caus[ed] a search and seizure without probable cause" by making material misrepresentations and omissions to secure the search warrants—an alleged act of judicial deception. (Dkt. Nos. 51 at 36, 54 at 5); *see Chism*, 661 F.3d at 386. Plaintiffs claim that such falsities were material because they implied Plaintiffs' alleged intent to violate tax laws. *But see Chism*, 661 F.3d at 389. The Court evaluates each of the alleged falsities below.

---

[1] As the Court finds that the warrants were not overly broad or lacking in specificity, the Court need not apply the "permeated with fraud" doctrine. *See Kow*, 58 F.3d at 426–28.

[2] Additionally, the reviewing court must find that the magistrate judge operated in a neutral and detached manner. *Leon*, 468 U.S. at 914. The Court finds so here.

### i. Credibility of CS1

Defendant interviewed CS1 and summarized their discussions in his affidavit. (*See* Dkt. No. 51-1 at 16–22.) CS1 claimed, among other things, that Plaintiffs: charged customers for state sales taxes without remitting the tax amounts to the Washington Department of Revenue ("DOR"); instructed customers to pay vehicle costs to General Electric Finance ("GE Finance") or Braun directly, rather than to AMC, to facilitate Plaintiffs' underreporting of income; and accepted cash payments from customers without making cash deposits into the AMC business checking account. (*Id.* at 18–21.) Plaintiffs argue that Defendant "repeatedly shades or outright omits key facts" as to CS1's credibility and "downplays" a material conflict of interest. (Dkt. No. 51 at 8–9.) Plaintiffs allege that Defendant misrepresented CS1's criminal history and in effect hid "a well-established pattern of [CS1] deceiving and harming her employers." (*Id.* at 9.)[3] Plaintiffs also allege that Defendant "knew yet omitted" the fact that CS1 had little knowledge about the VA's reimbursement policy and no formal training in bookkeeping, despite holding the bookkeeping duties for AMC during the period of alleged tax violations. (*Id.*) Plaintiffs further contend that CS1 founded a similar business after leaving AMC and, as a competitor of AMC, informed her business partner that she "intended to fund her business using the monetary award she anticipated she would receive for reporting AMC to law enforcement." (*Id.*) Plaintiffs claim that Defendant did not have evidence to corroborate CS1's testimony. (*Id.* at 11.)

An informant's infallibility or lack of ulterior motive are not prerequisites for probable cause. *Gates*, 462 U.S. at 246; *see also U.S. v. Meling*, 47 F.3d 1546, 1555 (9th Cir. 1995). In his affidavit, Defendant acknowledged CS1's criminal history and the alleged conflict of interest—CS1's participation in a similar economic market after leaving AMC. (*See* Dkt. No. 51-1 at 17.) Thus, Defendant disclosed salient facts regarding CS1's credibility despite Plaintiffs' claim that

---

[3] Defendant's affidavit states that CS1 was convicted of one count of fraud, which arose out of three separate occasions of stealing. (*See* Dkt. Nos. 51 at 8, 53 at 12.) Defendant's affidavit does not mention another civil suit against CS1 for embezzlement, which concluded with a default judgment. (*See id.*)

he withheld additional information. Moreover, even if Defendant's affidavit was inaccurate, Plaintiffs have not made a plausible showing of judicial deception because they have not made specific, non-conclusory factual allegations as to Defendant's knowing or reckless misrepresentation of CS1's credibility. (*See generally* Dkt. No. 51); *see also Iqbal*, 556 U.S. at 678; *Sprewell*, 266 F.3d at 988; *Ewing*, 588 F.3d at 1224.

### ii. DOR Audit and AMC Transactional History

Plaintiffs allege that Defendant withheld or misrepresented information about AMC's income, expenses, and tax payments in his affidavit. (*See* Dkt. No. 51 at 13–17.) Defendant relied on information regarding the DOR's audit of AMC, which began in 2011 and concluded on February 27, 2013. (*See* Dkt. No. 51-1 at 19–20.) Plaintiffs claim that Defendant made false statements about the DOR audit by: inferring AMC's reluctance and/or failure to comply with the DOR's requests for information; withholding that "DOR did not assess liability for many of the vehicles identified through the [Department of Licensing] records;" distorting the fact that "AMC offered to make a substantial tax payment in anticipation of a determination that AMC had collected but not remitted sales tax on certain transactions" and then made those payments; and withholding that "DOR did not assess any evasion penalties against AMC." (*Id.* at 13–15.) Plaintiffs further allege that Defendant: distorted the difference between state sales tax issues and federal income tax liability; withheld that AMC had underreported its expenses, in addition to its income; and withheld that Plaintiffs' "direct payments to GE *were* reported as income." (*Id.* at 15–16) (emphasis in original).

Plaintiffs further allege that "a correct analysis of the Braun records shows that Plaintiffs in fact *overreported* their taxable income." (*Id.* at 13, 16) (emphasis in original). Plaintiffs also allege that Defendant recklessly categorized AMC's bookkeeping system as a "scheme" that was "permeated with fraud" and withheld that the "DOR itself observed that AMC's files were a mess." (*Id.* at 6, 13.) Plaintiffs indicate that these alleged misrepresentations undermine Defendant's suggestion that Plaintiffs intended to violate tax laws, though intent is not relevant

to the probable cause inquiry. (*Id.*); *see Chism*, 661 F.3d at 389.

Defendant sought the search warrants "[b]ecause of what [he] believe[d] was AMC's fraudulent behavior in responding to [DOR's] requests." (*See* Dkt. No. 51-1 at 10–11.) Plaintiffs have not made specific factual allegations to show that Defendant founded this belief on his own knowing or reckless falsities as to AMC's income, expenses, and tax payments. *See Sprewell*, 266 F.3d at 988; *Ewing*, 588 F.3d at 1224. In light of Defendant's reasoning in his affidavit and the supporting facts, Plaintiffs have not made a plausible showing of judicial deception. *See Iqbal*, 556 U.S. at 678; *Franks*, 438 U.S. at 155–56, 171.

*iii. VA Reimbursements*

Plaintiffs challenge Defendant's statements in his affidavit regarding VA reimbursement. (*See* Dkt. No. 51 at 17–32.) Plaintiffs generally sought $2,000 in reimbursement from the VA for each van sold to a qualified veteran, which allegedly was the "usual and customary cost for the vans" and covered "AMC's actual shipping costs, as well as additional costs associated with readying each vehicle for delivery to the customer." (*Id.* at 20, 22.) Plaintiffs claim that VA employees instructed them to "enter their reimbursable freight costs onto blank bills of lading from Braun and submit it to the VA for reimbursement" and that such practice was "engaged in by other comparable vendors." (*Id.* at 20–21.)

Plaintiffs claim that Defendant misrepresented information regarding VA reimbursements in his affidavit because he did not cite to the authorities governing VA reimbursement for shipping costs for vehicles sold to qualifying veterans, and "deliberately omitted information indicating that the VA's practice was subject to a variety of interpretations and was inconsistent over time and among different VA employees." (*Id.* at 17–18.) Plaintiffs also claim that Defendant selectively "manipulated the inferences" drawn from Plaintiffs' communications with VA representatives about the reimbursement practices and policies, to "bolster his case for probable cause that Plaintiffs were acting with criminal intent." (*See id.* at 21–29.); *but see Chism*, 661 F.3d at 389. Plaintiffs claim that Defendant committed judicial deception because his

alleged misrepresentations resulted in "an incomplete portrait of industry practice, and incomplete context." (Dkt. No. 51 at 20–21.)

Plaintiffs provide interpretations of the VA's reimbursement policy that they allege were misrepresented or withheld from the affidavit, but they also concede that such policy was an "uncertain landscape." (*Id.* at 20.) Even if Defendant's affidavit contained inaccuracies regarding this policy, Plaintiffs have not raised factual allegations that plausibly establish that Defendant knowingly or recklessly made false statements regarding that policy. *See Iqbal*, 556 U.S. at 678; *Franks*, 438 U.S. at 155–56, 171; *Sprewell*, 266 F.3d at 988. Therefore, Plaintiffs have not made a plausible showing of judicial deception. While Plaintiff did not make a plausible showing of judicial deception, the Court will assess the "substantial basis for probable cause" inquiry. *See Leon*, 468 U.S. at 914–15.

### b. Substantial Basis for Probable Cause

Plaintiffs claim that Defendant's false statements were necessary for Judge Donohue's finding of probable cause because "[t]he cumulative effect of such false statements and omissions usurped the Magistrate Judge of his authority to make an independent determination of probable cause." (Dkt. No. 51 at 32.) The Court evaluates the necessity of each of the alleged falsities below.

#### i. Credibility of CS1

Plaintiffs claim that CS1's testimony provided the only basis of purported probable cause to search Plaintiffs' home, and they claim that CS1's testimony is not reliable given the alleged credibility issues discussed above. (*Id.* at 10); *see supra* Section II.C.2(a)(i). However, even in the absence of the alleged omissions or misrepresentations about CS1's credibility, probable cause could have been found from information provided by CS1. *Gates*, 462 U.S. at 246; *Meling*, 47 F.3d at 1555. Further, Plaintiffs did not address some of the information provided by CS1 that does contribute to a finding of probable cause, such as CS1's observations of customers making cash payments that were not deposited into the business bank account, and copies of AMC

invoices paid in cash. (*See* Dkt. No. 53 at 11–12.) Thus, Plaintiffs have not shown that but for the alleged misrepresentations of CS1's credibility, there would not have been a substantial basis of probable cause. *See Leon*, 468 U.S. at 914–15; *Franks*, 438 U.S. at 155–56.

### ii. DOR Audit and AMC Transactional History

In his affidavit, Defendant states several unchallenged facts pertaining to DOR's investigation, and Plaintiffs' financial records and correspondence. Defendant cited the DOR's finding that "AMC had admitted to failing to remit almost $300,000 in sales taxes" and that "AMC had underreported its gross receipts by over $4,000,000 for the time period of January 1, 2008 through March 31, 2012." (*Id.* at 20.) Defendant also cited records indicating that AMC customers made over $2,000,000 in direct payments to Braun, and emails from Plaintiffs to Braun directing these payments to specific invoice numbers, as evidence of Plaintiffs' efforts to not report the income on their corporate tax returns and to avoid reporting the state sales tax. (*Id.*) Defendant explained that DOR's numbers were based on records obtained from the Department of Licensing ("DOL"), which may have excluded some of the AMC vehicle titles, thus postulating that DOR's investigation could have understated the revenues that AMC failed to report. (*Id.* at 20–21.) Defendant also explained that "[t]he accounting numbers contained herein represent investigators' best efforts to assess and tabulate the transactions that were involved . . . based on information from subpoenaed records that may sometimes be incomplete or unclear." (*Id.* at 12.) Defendant also compared transactional activity in an AMC business checking account with information provided in AMC's tax forms, which contributed to his theory that Plaintiffs had underreported their income. (*See id.* at 24.) Defendant had "not seen evidence of any other business checking account maintained by AMC." (*Id.* at 22.) Plaintiffs do not dispute these factual findings, and these findings alone could have formed a substantial basis for Judge Donohue's finding of probable cause, thus rendering the searches of Plaintiffs' home and businesses valid. (*See* Dkt. No. 51 at 14–15); *Leon*, 468 U.S. at 914–15; *Franks*, 438 U.S. at 155–56.

### iii. *VA Reimbursements*

Defendant reviewed several audio and video recordings of conversations between Dale Jones, the VA prosthetics chief, and Mrs. Riveira, in which she admitted that "the actual shipping charges were approximately $750, and not $2,000, but that AMC had other costs of doing business" and in which Jones repeatedly reminded her that VA would only reimburse the actual cost of shipping. (Dkt. No. 51-1 at 26.) In his affidavit, Defendant discusses several interviews in which Braun general counsel and employees stated that the bills of lading produced by AMC were not legitimate Braun documents and that "Braun has never given AMC authority or permission to create or alter Braun documents." (*See id.* at 28–30.) These interviews provided substantial evidence of Plaintiffs' possible fraudulent claims for VA reimbursement, and Plaintiffs do not challenge the content of many of those interviews. (*See generally* Dkt. No. 51.) In light of Defendant's evaluation of Plaintiffs' probable criminal activity in his affidavit, Judge Donohue reasonably balanced the need to search Plaintiffs' home and businesses for evidence of criminal activity against the invasion entailed by that search. *See Camara*, 387 U.S. at 536–37. Plaintiffs have not raised a plausible claim to show otherwise because sufficient unchallenged facts remain which form a substantial basis for finding probable cause. *See Iqbal*, 556 U.S. at 678; *Leon*, 468 U.S. at 914–15.

In sum, Plaintiffs' second amended complaint cannot survive Defendant's motion to dismiss because Plaintiffs have not made a plausible claim for an unreasonable search and seizure that overcomes Defendant's qualified immunity defense. While Plaintiffs' Fourth Amendment rights were established at the time of the search, Plaintiffs have not plausibly alleged that their rights were violated. *See Pearson*, 555 U.S. at 232, 236. Plaintiffs also have not plausibly alleged that Defendant knowingly or recklessly made false statements in his affidavit. Further, even if the alleged false statements were taken as such, Plaintiffs have not shown that those collective statements provided the necessary basis for Magistrate Judge Donohue to find probable cause. *See Franks*, 438 U.S. at 155–56, 171. Furthermore, Plaintiffs have not shown

that the remaining unchallenged facts in the affidavit could not have formed a substantial basis for finding probable cause. *See Leon*, 468 U.S. at 914–15.[4]

### III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Plaintiffs' second amended complaint (Dkt. No. 53) is GRANTED. Plaintiffs' complaint is DISMISSED without leave to amend.

DATED this 18th day of July 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

---

[4] Because Plaintiffs do not overcome Defendant's qualified immunity defense, the Court need not reach the *Bivens* issue. (*See* Dkt. No. 51 at 4); *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).